No. 14-15298

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

ROBIN ANTONICK

Plaintiff – Appellant,

v.

ELECTRONIC ARTS INC.

Defendant – Appellee.

_____

On Appeal from
United States District Court, Northern District of California
Honorable Charles R. Breyer
D.C. No. 3:11-CV-01543-CRB

_____

**APPELLANT'S BRIEF**

_____

| | |
|---|---|
| Robert B. Carey | Stuart M. Paynter |
| Leonard W. Aragon | Jennifer L. Murray |
| HAGENS BERMAN SOBOL SHAPIRO LLP | Sara Willingham |
| 11 West Jefferson Street, Suite 1000 | THE PAYNTER LAW FIRM PLLC |
| Phoenix, Arizona 85003 | 1200 G Street N.W., Suite 800 |
| Telephone: (602) 840-5900 | Washington, DC 20005 |
| Facsimile: (602) 840-3012 | Telephone: (202) 626-4486 |
| | Facsimile: (866) 734-0622 |
| | |
| Walter H. Sargent | Steve W. Berman |
| WALTER H. SARGENT, P.C. | HAGENS BERMAN SOBOL SHAPIRO LLP |
| 1632 N. Cascade Ave. | 1918 Eighth Avenue, Suite 3300 |
| Colorado Springs, CO 80907 | Seattle, Washington 98101 |
| Telephone: (719) 577-4510 | Telephone: (206) 623-7292 |
| Facsimile: (719) 577-4696 | Facsimile: (206) 623-0594 |

*Counsel for Plaintiff – Appellant*

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ............................................................. 1

STATEMENT OF ISSUES ...................................................................... 1

STATEMENT OF THE CASE .................................................................. 2

I.  NATURE OF THE CASE ................................................................. 2

II.  FACTUAL BACKGROUND ............................................................. 4

    A.  The Contractual Relationship. ................................................ 4

    B.  Creating "Madden Football" .................................................. 8

    C.  EA's Access to Antonick's Intellectual Property ..................... 9

    D.  Release of Apple II Madden and Antonick's Role in
        Subsequent Versions. ......................................................... 10

    E.  Antonick's Discovery. ........................................................ 11

III.  COURSE OF PROCEEDINGS ........................................................ 13

    A.  The Lawsuit. .................................................................... 13

    B.  Pretrial Rulings. ............................................................... 13

    C.  The Trial. ........................................................................ 16

        1.  The Evidence. ............................................................ 17

        2.  The Verdict. .............................................................. 19

    D.  Post-Trial Proceedings and Judgment. .................................. 20

IV.  RULINGS PRESENTED FOR REVIEW .......................................... 20

SUMMARY OF ARGUMENT ................................................................ 21

STANDARD OF REVIEW .................................................................... 23

ARGUMENT .................................................................................... 24

I.  EA's failure to argue insufficient evidence of virtual identity of the
works as a whole in its Rule 50(a) motion precluded JMOL on that
basis. ........................................................................................ 24

II.  The district court incorrectly required Antonick to prove that Sega
Madden was "virtually identical" to Apple II Madden. ...................... 28

    A.  Requiring both (1) substantial similarity of protected
        elements and (2) virtual identity of the works as a whole was
        unsupported by law. ........................................................ 32

B.    The virtual identity standard is inconsistent with the parties' contractual definition of a "Derivative Work." ................................. 33

C.    The wide range of expression in protectable elements of Apple II Madden warrants broad protection under the "substantial similarity" standard. ...................................................... 34

    1.    Wide Range of Expression in Plays and Formations ............. 35

    2.    Significant Number of Protectable Elements ......................... 36

D.    The district court erroneously required virtual identity of the entire works, to be determined by the jury without expert help. ................................................................................................ 39

III.    Even under the test requiring virtual identity of the works as a whole, substantial evidence supports the verdict. ....................................... 43

IV.    The district court erroneously granted a new trial to EA regarding Antonick's claims for unpaid royalties on Derivative Works. .................... 46

A.    The court erroneously granted a new trial on virtual identity (Question Two of the special verdict form). ..................................... 46

B.    The court erroneously granted a new trial on substantial similarity (Question One of the special verdict form). ..................... 46

V.    The district court erred in dismissing claims based on the SNES platform. ....................................................................................................... 51

A.    The court erroneously concluded, as a matter of law, that the SNES and Apple II microprocessors are not in the same "Microprocessor Family. .................................................................. 51

B.    Even if the SNES microprocessor were not in the same Microprocessor Family as the Apple II microprocessor, Antonick's development of Apple II GS Madden revived his rights. ................................................................................................. 55

VI.    The district court erred in precluding evidence in support of Antonick's claim that EA breached its contractual obligations not to use or disclose his Development Aids. .................................................... 57

CONCLUSION ............................................................................................... 61

STATEMENT OF RELATED CASES ............................................................. 62

# TABLE OF AUTHORITIES

Page

CASES

*Ajaxo Inc. v. E*Trade Grp., Inc.*,
    135 Cal. App. 4th 21 (2005) ....................................................................59, 60

*Aliotti v. R. Dakin & Co.*,
    831 F.2d 898 (9th Cir. 1987) ...........................................................................44

*Altera Corp. v. Clear Logic, Inc.*,
    424 F.3d 1079 (9th Cir. 2005) .........................................................................42

*Apple Computer, Inc. v. Microsoft Corp.*,
    35 F.3d 1435 (9th Cir. Cir. 1994) .............................................................passim

*Associated Plumbing & Mech. Contractors of Sacramento, Inc. v. Local
    Union No. 447*,
    811 F.2d 480 (9th Cir. 1987) ...........................................................................23

*Atari Games Corp. v. Nintendo of Am. Inc.*,
    975 F.2d 832 (Fed. Cir. 1992) .........................................................................42

*Beech Aircraft Corp. v. United States*,
    51 F.3d 834 (9th Cir. 1995) .......................................................................47, 48

*City of Hope Nat. Med. Ctr. v. Genentech, Inc.*,
    43 Cal. 4th 375 (2008) .....................................................................................54

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*,
    982 F.2d 693 (2d Cir. 1992) .................................................................41, 42, 43

*Conseco Fin. Servicing Corp. v. N. Am. Mortgage Co.*,
    381 F.3d 811 (8th Cir. 2004) ...........................................................................27

*Cooling Sys. & Flexibles, Inc. v. Stuart Radiator, Inc.*,
    777 F.2d 485 (9th Cir. 1985), *overruled on other grounds*, *Fogerty v.
    Fantasy, Inc.*, 510 U.S. 517 (1994)................................................................39

*Cooter & Gell v. Hartmarx Corp.*,
    496 U.S. 384 (1990).........................................................................................46

005004-11  706437 V1

*Dawson v. Hinshaw Music Inc.*,
905 F.2d 731 (4th Cir. 1990) ............................................................42

*Dennis v. Gen. Elec. Corp.*,
762 F.2d 365 (4th Cir. 1985) ............................................................48

*Diesel Elec. Sales & Serv., Inc. v. Marco Marine San Diego, Inc.*,
16 Cal. App. 4th 202 (1993) .............................................................56

*Doe ex rel. Rudy-Glanzer v. Glanzer*,
232 F.3d 1258 (9th Cir. 2000) ..........................................................50

*Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*,
109 F.3d 1394 (9th Cir. 1997) ..........................................................39

*E.E.O.C. v. Go Daddy Software, Inc.*
581 F.3d 951 (9th Cir. 2009) ............................................................27

*E.E.O.C. v. Pape Lift, Inc.*,
115 F.3d 676 (9th Cir. 1997) ............................................................23

*Ets-Hokin v. Skyy Spirits, Inc.*,
225 F.3d 1068 (9th Cir. 2000) ..........................................................23

*Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.*,
786 F.2d 1342 (9th Cir. 1985) ..........................................................25

*Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*,
499 U.S. 340 (1991)..........................................................................39

*Freund v. Nycomed Amersham*,
347 F.3d 752 (9th Cir. 2003) ............................................................24

*Funky Films, Inc. v. Time Warner Entertainment Co.*,
462 F.3d 1072 (9th Cir. 2006) ..........................................................30

*Gates Rubber Co. v. Bando Chem. Indus., Ltd.*,
9 F.3d 823 (10th Cir. 1993) ........................................................41, 42

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010), *aff'd*, 131 S. Ct. 2238 (2011) ............27

005004-11  706437 V1

*In re Quantification Settlement Agreement Cases*,
   201 Cal.App.4th 758 (Cal. Ct. App. 2011) .......................................................34

*Jada Toys, Inc. v. Mattel, Inc.*,
   518 F.3d 628 (9th Cir. 2007) ..............................................................................29

*Janes v. Wal-Mart Stores Inc.*,
   279 F.3d 883 (9th Cir. 2002) ..............................................................................25

*Kirsch v. Fleet St., Ltd.*,
   148 F.3d 149 (2d Cir. 1998) ................................................................................28

*Kohus v. Mariol*,
   328 F.3d 848 (6th Cir. 2003) ..............................................................................42

*Lifshitz v. Walter Drake & Sons, Inc.*,
   806 F.2d 1426 (9th Cir. 1986) ............................................................................26

*Mattel, Inc. v. MGA Entm't, Inc.*,
   616 F.3d 904 (9th Cir. 2010) ........................................................................passim

*Murphy v. City of Long Beach*,
   914 F.2d 183 (9th Cir. 1990) ........................................................................25, 28

*Newton v. Diamond*,
   388 F.3d 1189 (9th Cir. 2004) ............................................................................45

*OG Int'l, Ltd. v. Ubisoft Entm't*,
   2011 WL 5079552 (N.D. Cal. Oct. 26, 2011) (Breyer, J.), *aff'd sub nom.*
   *OG Int'l, Ltd. v. Ubisoft, Inc.*, 468 F. App'x 787 (9th Cir. 2012) .....................40

*Olson v. Nat'l Broad. Co., Inc.*,
   855 F.2d 1446 (9th Cir. 1988) ............................................................................39

*Oracle Am., Inc. v. Google Inc.*,
   750 F.3d 1339 (Fed. Cir. 2014) ...........................................................37, 38, 51

*Oracle Am., Inc. v. Google Inc.*,
   872 F. Supp. 2d 974 (N.D. Cal. 2012).................................................................36

*Parsons v. Bristol Development Co.*,
   62 Cal. 2d 861 (1965) .........................................................................................54

-v-

*Sega Enterprises Ltd. v. Accolade, Inc.*,
   977 F.2d 1510 (9th Cir. 1992) ............................................................42

*Sharp Structural, Inc. v. Franklin Mfg., Inc.*,
   283 F. App'x 585 (9th Cir. 2008)......................................................26

*Shaw v. Lindheim*,
   919 F.2d 1353 (9th Cir. 1990) ............................................................40

*Softel, Inc. v. Dragon Med. & Scientific Commc'ns*,
   118 F.3d 955 (2d Cir. 1997) ...............................................................50

*Sony Computer Entm't, Inc. v. Connectix Corp.*,
   203 F.3d 596 (9th Cir. 2000) ............................................................47

*Stott v. Johnston*,
   36 Cal. 2d 864 (1951) .......................................................................56

*Tavaglione v. Billings*,
   4 Cal. 4th 1150 (1993) .......................................................................59

*Three Boys Music Corp. v. Bolton*,
   212 F.3d 477 (9th Cir. 2000) ......................................................passim

*Tolbert v. Queens Coll.*,
   242 F.3d 58 (2d Cir. 2001) ...............................................................27

*Urantia Found. v. Maaherra*,
   114 F.3d 955 (9th Cir. 1997) ............................................................39

*Warner Bros. Inc. v. Am. Broadcasting Cos.*,
   654 F.2d 204 (2d Cir. 1981) .............................................................30

*Zachar v. Lee*,
   363 F.3d 70 (1st Cir. 2004).............................................................27

## STATUTES

17 U.S.C. § 102(b) ...............................................................................36

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1332 ............................................................................................1

Cal Civ. Code § 1641 ................................................................................34

**OTHER AUTHORITIES**

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.03[A][1][c] ....................................................................................41

Fed. R. Civ. P. 50 ......................................................................................25

Fed. R. Civ. P. 50(a) ..........................................................................passim

Fed. R. Civ. P. 50(a)(2) .............................................................................24

Fed. R. Civ. P. 50(b) ..........................................................................passim

Fed. R. Civ. P. 50(c) ...................................................................................2

U.S. CONST. amend. VII ......................................................................24, 25

005004-11  706437 V1

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1332, because the parties were citizens of different states and the amount in controversy exceeded $75,000. The district court entered final judgment disposing of all claims on January 22, 2014. ER 24.  Notice of appeal was timely filed on February 19, 2014. ER 25-26. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

Whether the district court exceeded its authority by granting judgment as a matter of law under Fed. R. Civ. P. 50(b) on a ground not previously asserted in a preverdict motion under Fed. R. Civ. P. 50(a).

 Whether the district court correctly held, as a matter of law, that although the developer of a football video game was contractually entitled to receive royalties on sales of any "Derivative Work," including adaptations and works with "significant enhancements," he was not entitled to any royalties unless he could prove that the allegedly Derivative Work was, as a whole, "virtually identical" to his original game as a whole.

Whether the district court erroneously held that the evidence was insufficient to support the jury's verdict that defendant's football video games were, as a whole, virtually identical to plaintiff's games.

Whether the district court abused its discretion in conditionally granting a new trial to defendant under Fed. R. Civ. P. 50(c).

Whether the district court erroneously determined, as a matter of law, that plaintiff was not entitled to royalties on a Super Nintendo video game because it was allegedly built for a different microprocessor family.

Whether the district court erroneously precluded evidence that defendant breached contractual obligations not to use or disclose plaintiff's software "Development Aids" without his permission.

## STATEMENT OF THE CASE

### I.    NATURE OF THE CASE

This is a contract case. Appellant Robin Antonick is the original programmer of the John Madden Football videogame series ("Madden"). In 1986, Antonick and appellee Electronic Arts, Inc. ("EA") entered into a software development and publishing agreement pursuant to which Antonick would develop Madden for the Apple II, Commodore 64, and IBM platforms, and consult on the

-2-

development of additional games, in return for royalties on those works and any "Derivative Works." ER 555 §§ IV-V.

Antonick worked on the development of Madden for several years. In 1988, the Apple II version of Madden was released. According to EA, the game was an "overnight success" that "went on to sell more copies than any other sports game of its time." ER 452.

Following the release of Apple II Madden, EA contracted with Antonick to develop the game for additional platforms, including Sega Genesis. ER 676. In 1990, however, EA informed Antonick that it had contracted with another company, Park Place Productions, to develop the Sega Genesis game. ER 772:23-773:17. Because the Sega game would purportedly be developed independently, Antonick would receive no royalties on its sales as a Derivative Work. *Id*. Over the next two decades, EA produced and sold Madden for Sega and other platforms, paying no royalties to Antonick for the allegedly independent works. ER 358, 448-454, 455-458.

Beginning in 2009, following the publicity surrounding EA's twentieth anniversary of Madden and subsequent research, Antonick learned that, contrary to its earlier representations, EA had used his work on Apple II Madden to develop the game for Sega and other platforms. ER 753:8-754:8; 755:9-760:13. In 2011,

Antonick commenced this action, alleging that EA had breached contractual duties to pay royalties on Derivative Works, offer him the right of first refusal to develop Derivative Works, and protect the confidentiality of intellectual property. ER 1011-1039.

Following trial, a jury found, by special verdict, that Sega Madden was a Derivative Work of Apple II Madden for which Antonick was owed royalties. ER 322. Six months after the verdict, however, the district court granted EA's motion for judgment as a matter of law, holding that the evidence did not show that any version of Sega Madden was "virtually identical" to Apple II Madden, so Sega Madden could not be considered a "Derivative Work" on which Antonick was entitled to royalties. ER 1, 8-15, 23. In the alternative, the district court held that the verdict was against the clear weight of the evidence, entitling EA to a new trial. ER 1, 16-21, 23. The district court also dismissed Antonick's claims for breach of his right of first refusal and breach of confidentiality, holding that Antonick failed to show "separate damages" for those claims. ER 21-22, 23.

## II.     FACTUAL BACKGROUND

### A.     The Contractual Relationship.

Robin Antonick is a software designer. After graduating from college in 1979, Antonick and a partner founded Data Trek, which designed, coded,

-4-

published, and sold business, entertainment, and educational software.
ER 746:6-12. With Antonick as CEO, Data Trek was a profitable company that
quickly grew from two partners to about thirty employees. *Id*. at 746:13-747:8.

By 1983, Antonick had become increasingly interested in developing
entertainment software, while his partners wanted to focus on business software.
ER 747:15-22. Antonick decided to leave Data Trek, selling back his share of the
company to his partners. ER 747:15-748:1. He also began discussions with EA,
which made videogames. *Id*.

Antonick, a former college football player, was particularly interested in
developing a football videogame. ER 745:4-746:5. EA's founder and CEO,
William "Trip" Hawkins, also wanted to develop a football game, but needed
someone who could actually implement a game with a large number of players.
ER 967:24-968:9. EA knew that it would be "very difficult" to do. ER 743:8-14.
At the time, there were no realistic football videogames on the market; the state of
the art was a game with just three players per side. ER 749:11-16.

By early 1984, Antonick had developed a prototype of a football videogame,
running on an Apple II computer, with a full complement of eleven players per
side. ER 749:20-750:16. After presenting his prototype to EA, Antonick was
engaged, as an independent contractor, to develop a commercial version of his

-5-

game for EA in exchange for royalties on versions that he developed or that were derived from his work. ER 967:13-968:12; 689-717. In 1985, EA contracted with John Madden, the well-known coach and commentator, to lend his name to the game. ER 534-550.

In December 1986, EA ("the Publisher") and Antonick (the "Artist") negotiated a revised agreement (the "1986 Contract"), pursuant to which Antonick would develop the newly titled "John Madden Football" videogame for the Apple II, Commodore 64, and IBM platforms. ER 555-558 § IV. In addition to receiving compensation for those "Works," Antonick would be entitled to royalties on all "Derivative Works," defined as:

> Any computer software program or electronic game which either (a) constitutes a derivative work of the Work within the meaning of the United States copyright law or (b) produces audiovisual effects which infringe the copyright in the audiovisual effects produced by the Work. Derivative Works include, for example, significant enhancements of the Work to add additional features or improve performance and adaptations of the Work to operate on computers or operating systems other than those described in the Specifications.

ER 560 § 1.03. EA also promised to (i) protect against unauthorized use of Antonick's intellectual property, including his Development Aids,[1] and (ii) offer Antonick a right of first refusal to develop Derivative Works. ER 567-568 § 5.02; 572 § 8.03; 574 § 9.04.

In February 1987, Antonick and EA executed Amendment 1 to the 1986 Contract. Among other things, Antonick agreed to a higher royalty rate on sales of Works and "Derivative Works by Artist" and, depending on the microprocessor used, a lower or higher royalty rate on "Derivative Works by Publisher." ER 485-489. Of particular note, Antonick was to receive a royalty for any Derivative Work in the same "Microprocessor Family" as the Apple II's microprocessor. ER 487. Amendment 1 limited Antonick's right of first refusal to Derivative Works developed for certain Microprocessor Families, but also provided that if Antonick developed a Derivative Work for a "new" Microprocessor Family, his right of first refusal would be revived with respect to that family. *Id.* Finally, EA promised "not to use or otherwise provide" Antonick's Development Aids to employees or third parties in preparing Derivative Works on different microprocessor families. ER 488.

---

[1] "Development Aids" included equipment, firmware, and software utilities developed or used by Antonick that might be useful in developing Derivative Works. ER 569 § 5.05.

### B.    Creating "Madden Football."

In "Madden Football," Antonick sought to create a realistic model of an actual National Football League game, mimicking the physics of the players and the ball in motion while approximating the decision-making and skills of actual NFL players.  ER 822:12-824:12; 984:21-985:2. To that end, Antonick, assisted by Hawkins, created a player ratings model that would provide a template for rating each NFL player on a variety of attributes. The selection of attributes was not a trivial task; Hawkins testified that it took "years" to develop the player rating structure embodied in the game. ER 439-440. Eventually, Antonick and Hawkins settled on a collection of fewer than a dozen attributes, such as speed and ball-handling ability, upon which each player would be rated. Antonick, with the help of assistant producer Mike Kawahara, determined ratings for each NFL player with respect to each attribute. ER 810:13-811:2; 834:9-15.

Drawing on his football knowledge, Antonick married the player ratings structure with an elaborate system of plays. With the help of Kawahara, he created hundreds of offensive and defensive plays. ER 820:11-821:16. After signing John Madden, Hawkins became more involved, collaborating with Antonick to refine the existing plays and play-calling to incorporate Mr. Madden's ideas. ER 825:16-21; 833:18-834:6. As well as reviewing his playbook, Antonick and

Hawkins spent many hours with Mr. Madden, discussing, among other things, plays and play-calling. ER 826:1-827:1; 828:14-829:3; 829:25-831:4; 832:13-19. These conversations became a "major part" of the game's design. ER 969:15-17.

Like the player ratings scheme, the development of the game's plays was the result of a highly creative and original effort. Mr. Madden's playbook had no "fixed plays" in it, only "skeleton plays" that were "illustrative of his beliefs about football." ER 815:8-11. From the principles outlined in these "skeleton plays," "you can make an infinite number of football plays." ER 150:7-9. As such, there was a "whole lot of organizing and refinement and editing to come up with a good scheme." ER 150:20-22.

## C. EA's Access to Antonick's Intellectual Property.

Richard Hilleman, an EA employee, eventually joined the Madden project as a producer on the Apple II game. ER 892:24-893:6. Antonick spoke with Hilleman regularly, discussing, among other things, the execution of game features and solutions to implementation issues. ER 792:20-23; 793:15-20. In addition, Antonick was required to deliver detailed documentation of his code and other intellectual property, including (i) "complete assembled source code with sufficient comments to allow the easy understanding of each routine, subroutine and table by an individual conversant with 6502 assembly language"; (ii) "an overall program

description, including the file name of each module of code," "a narrative of the

flow of control," "a complete list of subroutines with a short description of each,"

and "an explanation of key data structures"; and (iii) a description of "any

firmware or software utilities used." ER 587, 640, 646; 1042-1045; 1202-1203.

### D. Release of Apple II Madden and Antonick's Role in Subsequent Versions.

After Apple II Madden was released in 1988 to "overnight success," *see*

ER 452, EA contracted with Antonick to develop additional games.[2] In November

1988, the parties entered into Amendment VI to the 1986 Contract, requiring

Antonick to develop Madden for the Apple II GS computer. ER 673-675.

Apple II GS Madden was released soon thereafter. *See* ER 551-552, 874:2-5.

In October 1989, Antonick and EA entered into Amendment VIII to the

1986 Contract, requiring Antonick to develop a "script" and a technical design

review (TDR) for Sega Genesis and Nintendo versions and providing that

Antonick would receive "additional compensation" in the form of 3% royalties on

sales of any "Nintendo Derivative Work" or "Sega Genesis Derivative Work."

ER 676-677. As producer on the Nintendo version, Hilleman reviewed Antonick's

design script and discussed Antonick's ideas for console games. ER 895:16-899:25.

---

[2] Pursuant to the 1986 Contract, IBM and Commodore Madden were completed and released in 1989. ER 363.

-10-

In August 1990, Hilleman told Antonick that EA had decided not to publish Derivative Works for Nintendo or Sega Genesis. ER 772:23-773:17. Instead, Hilleman said that EA was going in a different direction with a Sega Genesis game with "more of an arcade style." *Id*. Hilleman said that EA had already hired another company, Park Place Productions, to develop the new Sega game "independently" of Antonick's work, without using his intellectual property, source code, or methods. *Id*. Because there would be a separation between Antonick's work and the development of the Sega game, Antonick would have no royalty or other rights in the Sega game. *Id*. Hilleman also told Antonick that the "Nintendo marketplace had started to disintegrate" and to stop working on Nintendo Madden. *Id*. He directed Antonick instead to concentrate on developing a second IBM Madden. ER 773:8-11. Antonick did so, communicating regularly with Hilleman during 1990-91. ER 776:8-9; 785:3-13.

### E. Antonick's Discovery.

After Antonick completed his work on the second IBM game in 1992, his work with EA was substantially over, and he moved on to other projects. ER 751:21-752:11. Meanwhile, over the next two decades, EA continued to produce Madden on a number of computer platforms, including Sega and Nintendo. *See* ER 448-454; 455-458.

-11-

In 2009, in conjunction with its celebration of Madden's twentieth anniversary, EA released publicity materials describing the game's history. ER 755:13-756:10. To Antonick's surprise, the materials traced the current Madden game to Antonick's Apple II Madden. ER 756:4-17. Later, at the suggestion of an acquaintance, Antonick viewed a CNBC interview of Trip Hawkins, who also traced the Madden franchise back to Apple II Madden, noting that it "took four years" to create. ER 757:21-758:12.

The CNBC interview caused Antonick to do additional research, leading him to the website of Park Place co-founder Troy Lyndon, who credited EA's Hilleman with helping to develop 1990 Sega Madden and spending "countless hours" with Park Place programmer Jim Simmons to make the game more realistic. ER 758:13-760:5. Antonick then realized that, contrary to Hilleman's earlier assurances, Sega Madden had not been developed independently of Antonick's work on Apple II Madden, in a "clean room" without the assistance of those who, like Hilleman, had worked on Apple II Madden and had intimate knowledge of its code and design. *Id.*

## III.  COURSE OF PROCEEDINGS

### A.  The Lawsuit.

In March 2011, Antonick commenced this action, alleging claims for breach of EA's contractual duties to pay royalties due on Derivative Works of Apple II Madden, protect confidential intellectual property, honor his right of first refusal to develop Derivative Works, and refrain from unauthorized use or disclosure of his Development Aids.[3] ER 1011-1039. The court ordered a three-phase trial, addressing (1) EA's statutory limitations defense, (2) EA's liability with respect to Madden games released before 1996, and (3) EA's liability with respect to non-Madden games and post-1996 Madden games. ER 470, 471-484.

### B.  Pretrial Rulings.

The district court issued a number of pretrial rulings significantly limiting Antonick's case. First, in response to EA's third motion for summary judgment, the court held that the definition of "Derivative Work" in the 1986 Contract was "limited to derivative works within the meaning of United States copyright law," so in order to establish his claim for additional royalties on Sega and other versions

---

[3] Among the Development Aids allegedly misappropriated were Antonick's player editor, play editor, team editor, playbook editor, and method for instant replay. ER 463-466.

005004-11 706437 V1

of Madden, Antonick was required to show that EA engaged in copying that, absent consent, would violate federal copyright law. ER 1212-1213.

Second, the court held that, absent direct evidence that EA literally copied his code, Antonick could prove copying circumstantially only by showing "substantial similarities" between protectable elements of Apple II Madden and the allegedly Derivative Works. ER 1216-1218. Antonick had identified the following similarities:

- player ratings

- decision points

- ball carrier pursuit

- order of offensive players on roster

- direction tracking system

- method for flipping the view of the field upon change of possession

- names of variables, subroutines, and plays

- instant replay design

- field width

- plays and formations

- data flow architecture

-14-

According to the court, however, only two of these – (1) field width and (2) plays and formations – were even arguably protected under copyright law, while the rest were unprotectable methods, systems, names, or algorithms or so inherent to football as to constitute mere *scenes a faire* to which no copyright claim could be made. ER 1218-1233.

Third, the court held that, "[d]ue to the narrow range of possible expression for a football video game and the fact that only two of the ten [sic] similar elements are protectable … Antonick's work is entitled to only thin protection" under copyright law, so Antonick would be required to prove – in addition to substantial similarity of protectable elements – that "an ordinary reasonable observer would consider Antonick's work and the later <u>Madden</u> versions *virtually identical when viewed as a whole*." ER 353-354 (emphasis added).

Fourth, the court dismissed Antonick's claims that EA breached contractual duties to protect confidential information and to offer Antonick a right of first refusal to develop any Derivative Works, concluding that Antonick failed to demonstrate damages "separate" from unpaid royalties on Derivative Works. Regarding Antonick's claim that EA violated obligations not to use or disclose his Development Aids, the court made no specific rulings, but precluded Antonick from introducing evidence in support of any claims other than EA's breach of

-15-

obligations to pay royalties for Derivative Works and refused to permit any other claims to go to the jury. ER 355.

### C.    The Trial.

The first phase of the trial began in June 2013 and required the jury to consider whether Antonick's action was barred by applicable statute of limitations. ER 357. The jury found that Antonick proved that before November 21, 2005, he did not discover or know of facts that would have caused a reasonable person to suspect that EA had breached the 1986 Contract. ER 356. Antonick's action was therefore timely.

In the second phase, the same jury was asked to determine whether Antonick proved "substantial similarities" between Apple II Madden and Sega Madden[4] with respect to the expression in the source code of (1) field width or (2) plays and formations. Then, for any Sega Madden game for which the jury found substantial similarities in either of those elements, the jury was asked to determine whether

---

[4] At trial, Antonick sought to show that, in addition to Sega Madden, five versions of the game released for the Super Nintendo Entertainment System (SNES) were also Derivative Works on which Antonick was entitled to royalties. The court, however, held that the SNES and Apple II microprocessors were not in the same "Microprocessor Family," so under Amendment 1 to the 1986 Contract, Antonick was entitled to no royalties on SNES Madden. ER 952:25-959:22.

-16-

Antonick proved that the game was "virtually identical" to Apple II Madden when the games were considered as a whole. ER 1010:17-25.

### 1. The Evidence.

In his case-in-chief, Antonick presented substantial evidence that EA and its contractor, Park Place, had not developed Sega Madden independently, but rather had copied significant portions of his work on Apple II Madden. First, Antonick showed that the developers of Sega Madden had access to his work on Apple II Madden. EA employees with extensive access to and knowledge of his code and other intellectual property also worked on Sega Madden, and were never prohibited from using design documents, algorithms, or development materials from Antonick's games. ER 878:6-8; 878:24-879:25; 974:22-975:4. EA, in fact, conceded that Sega Madden's developers had "access" to Antonick's work for purposes of copyright law. ER 998:15-17.

Hilleman, in particular, was in regular communication with Park Place, including programmer Jim Simmons, who had never developed a football videogame before. *See* ER 881:21-882:3; 978:13-25. According to assistant producer Michael Brook, Simmons's game in July 1990 still had "[n]o plays, nothing. No play calling." ER 973:1-20. EA nevertheless decided to (1) convert the Sega game from a relatively simple arcade format to a more realistic Madden game

-17-

and (2) advance the release date to December 1990, so that it would be available before Christmas. ER 870:3-11; 976:14-23. To complete 1990 Sega Madden in such a tight timeframe, EA employees provided Simmons with play diagrams, play calling tables, and player rating information. ER 979:19-980:15; 981:8-982:10.

Second, Antonick showed that Sega and Apple II Madden were substantially similar, particularly with regard to plays and formations. Trip Hawkins testified that "many" plays on Apple II Madden were used in 1990 Sega Madden. ER 991:5; *see also id*. at 966:8-11; 108:1-7. In addition, Kawahara, who was intimately involved in the design of the plays for Antonick's game, testified that, in playing 1990 Sega Madden, he found that the plays "looked identical to the original Apple II version." ER 812:2-814:5; 817:17-818:3.

Expert testimony also supported Antonick's claims. Michael Barr, Antonick's source code expert, testified that the play "formations" in 1990 Sega Madden were "for all practical purposes the same" as those in Apple II Madden and "initial player movement" was "very similar" or "effectively the same" for "most" plays. ER 931:2-14. Barr further testified that 1990 Sega Madden ordered and numbered plays in the same manner as Antonick's plays, and in many cases used identical names. *See generally* ER 910:16-917:25; 950:25-951:14. Further confirming copying of expressions of plays in Antonick's source code, Barr

-18-

testified that 1990 Sega Madden plays also used Apple II Madden's directional controls. ER 963:2-24. Finally, Barr identified unique character strings in Antonick's play calling code also appearing in 1990 Sega Madden's code. *See* ER 934:12-941:16.

Regarding later versions of Sega Madden, Barr testified that the plays in 1990 Sega, derived from Apple II Madden, were also found in subsequent Sega versions. *See* ER 942:24-943:4. According to Barr, it was, "basically, the same set of games continuing through from the 1990 to the 1995" version. ER 945:21-22; *see also id.* at 946:25-947:3 ("overall, that the games in the Sega 1990 through Sega 1995 … that we have contain a set of plays that includes a subset of the plays in Mr. Antonick's games."). Barr walked through an example of a play from 1995 Sega Madden, and demonstrated how plays persisted from Apple II Madden to 1995 Sega Madden. ER 943:14-944:17. Barr also testified that he found no evidence that subsequent versions of Sega Madden ever eliminated plays used in both Apple II Madden and 1990 Sega Madden; in fact, additional plays from Apple II Madden were added to later Sega versions. ER 945:8-22.

### 2. The Verdict.

On July 23, 2013, the jury reached a verdict. In response to Question One of the special verdict form, the jury found that Antonick had proved substantial

-19-

similarities between the Sega Madden games and Apple II Madden with respect to plays and formations, but not with respect to field width. ER 322. In response to Question Two, the jury found that Antonick proved that each Sega Madden game was virtually identical to Apple II Madden when considered as a whole. ER 323.

### D. Post-Trial Proceedings and Judgment.

In January 2014, six months after verdict, the court granted EA's motion for judgment as a matter of law (JMOL), holding that evidence did not show that any version of Sega Madden was "virtually identical" to Apple II Madden, so the jury's answer to Question Two of the special verdict form was not supported by evidence, and Sega Madden was not a Derivative Work on which Antonick was entitled to royalties. ER 1-23.  In the alternative, the court held that the verdict was against the clear weight of the evidence, entitling EA to a new trial. *Id.*

## IV. RULINGS PRESENTED FOR REVIEW

Antonick seeks review of the district court's rulings that:

- Only two features of Antonick's work – (1) plays and formations and (2) field width – were potentially protectable under copyright law.

- To receive royalties on any version of Sega Madden, Antonick was required to show that it was "virtually identical" to Apple II Madden when the two works were considered "as a whole."

- Antonick was not entitled to present evidence of EA's breach of contractual obligations not to use or disclose Antonick's Development Aids to EA's employees or third parties.

- The microprocessors for SNES and Apple II Madden were not in the same "Microprocessor Family," so Antonick was not entitled to any royalties on SNES Madden.

- EA's failure to argue insufficiency of evidence of virtual identity of the works as a whole (Question 2 of Special Verdict Form) in its Fed. R. Civ. P. 50(a) motion did not preclude the district court from entering judgment as a matter of law on that basis.

- The evidence was not sufficient to support the jury verdict finding virtual identity of Apple II Madden and Sega Madden as a whole, and in the alternative, the verdict finding virtual identity and substantial similarity of protectable elements was against the clear weight of the evidence.

## SUMMARY OF ARGUMENT

Regarding Antonick's claim for unpaid royalties on Derivative Works, the court erroneously entered JMOL for lack of evidence that Sega Madden and Apple II Madden were "virtually identical" when considered "as a whole." First,

EA never argued insufficient evidence of virtual identity of the works as a whole in its Rule 50(a) motion, precluding the court from granting JMOL on that basis under Rule 50(b).

Second, particularly where the 1986 Contract expressly included, in its definition of Derivative Works, "adaptations" and games with "significant enhancements," and where there was a wide range of expressing the elements of a football videogame, the court incorrectly required Antonick to prove that, in addition to substantial similarity of protectable elements, Sega Madden and Apple II Madden were virtually identical as a whole.

Third, even under a test requiring virtual identity of the works as a whole, the court erred in finding insufficient evidence to support the verdict.

Fourth, the court abused its discretion in conditionally granting a new trial to EA on Antonick's claims for unpaid royalties on Derivative Works, based on its belief that (1) the clear weight of evidence was against the jury's finding of virtual identity and (2) Antonick's expert witness relied on "flawed methods" to show substantial similarity in protected elements.

Fifth, the court erred in dismissing claims for royalties on SNES Madden, based on its conclusion that, as a matter of law, the microprocessors in Apple II and SNES were not in the same "Microprocessor Family."

-22-

Sixth, the district court erred in precluding evidence that EA breached obligations not to use or disclose Antonick's Development Aids without permission.

## STANDARD OF REVIEW

A district court's grant of JMOL is reviewed *de novo.* A district court's determination as to the scope of copyright protection is also reviewed *de novo. Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 914 (9th Cir. 2010); *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1073 (9th Cir. 2000). "When a district court's decision is based upon analysis of the contractual language and application of the principles of contract interpretation, the decision is a matter of law and reviewable *de novo.*" *Associated Plumbing & Mech. Contractors of Sacramento, Inc. v. Local Union No. 447*, 811 F.2d 480, 482 (9th Cir. 1987). A district court's decision concerning a motion for a new trial is reviewed for an abuse of discretion. However, a stringent standard applies when the motion is based on insufficiency of the evidence. A motion will be granted on this ground only if the verdict "is against the 'great weight' of the evidence, or it is quite clear that the jury has reached a seriously erroneous result." *E.E.O.C. v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir. 1997).

# ARGUMENT

**I.  EA's failure to argue insufficient evidence of virtual identity of the works as a whole in its Rule 50(a) motion precluded JMOL on that basis.**

"A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury." Fed. R. Civ. P. 50(a)(2). The motion must "specify the judgment sought and the law and facts that entitle the movant to judgment." *Id*. If the court does not grant the preverdict motion under Rule 50(a), it may be renewed after trial pursuant to Rule 50(b). "Because the Rule 50(b) motion is only a renewal of the preverdict motion," however, "it can be granted only on grounds advanced in the preverdict motion." Advisory Comm. Notes to the 2006 Amendments, Fed. R. Civ. P. 50.

"The purpose of this rule is twofold." *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003). "First it preserves the sufficiency of the evidence as a question of law, allowing the district court to review its initial denial of judgment as a matter of law instead of forcing it to engage in an impermissible reexamination of facts found by the jury." *Id. See also* U.S. Const. amend. VII. "Second, it calls to the court's and the parties' attention any alleged deficiencies in the evidence at a time when the opposing party still has an opportunity to correct

them." *Id.*[5] "For the same reasons a party may not seek a JNOV on grounds not alleged in their [sic] motion for directed verdict, a district court may not enter a JNOV on grounds not asserted in a party's motion for directed verdict." *Murphy v. City of Long Beach*, 914 F.2d 183, 186 (9th Cir. 1990).

Here, the district court exceeded its authority by entering JMOL based solely upon a ground never asserted by EA in its preverdict Rule 50(a) motion. The court granted JMOL as to Question Two of the jury's verdict, holding that "there is no legally sufficient basis for the jury's verdict that any of the Sega Madden games as a whole are virtually identical to Apple II as a whole." ER 10-11. That ground, however, was never raised in EA's Rule 50(a) motion. Indeed, EA never mentioned the games as a whole. To the contrary, EA's Rule 50(a) motion focused solely on Question One, arguing that Antonick had failed to prove that the two protectable features of "field width" and "plays and formations" were virtually identical in the Apple II and Sega Madden games.[6] ER 346-349. Although the

---

[5] This Court construes the procedural requirements of Rule 50 strictly so as to obviate the necessity of engaging in case-specific determinations of prejudice. *Janes v. Wal-Mart Stores Inc.*, 279 F.3d 883, 887 (9th Cir. 2002); *Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.,* 786 F.2d 1342, 1346 n.2 (9th Cir. 1985).

[6] EA's Rule 50(a) argument also applied the wrong standard to protected elements – virtual identity instead of substantial similarity – and thus was also insufficient to preserve any challenge to the jury's finding, under Question One, that protected elements were substantially similar. However, because JMOL was

court stated, in a footnote and without elaboration, that "EA adequately preserved the arguments" addressed in its Rule 50(b) Order (ER 5 n.2), that statement was erroneous. Because EA's 50(a) motion failed to assert any arguments whatsoever as to Question Two, "[t]he result is a complete waiver, precluding our consideration of the merits of the issue." *Sharp Structural, Inc. v. Franklin Mfg., Inc.*, 283 F. App'x 585, 588 (9th Cir. 2008).

Nor can EA's waiver be excused because the question of substantial similarity of plays and formations and the question of virtual identity of the games as a whole are both elements of Antonick's contract claim (as defined by the court in the jury instructions). The jury instructions required Antonick to prove *both* substantial similarity of one or more protected features *and* virtual identity of the games as a whole, including features unprotected by copyright law. "A [Rule 50(a)] motion can . . . serve as the prerequisite to a [Rule 50(b) motion] only if it includes the specific grounds asserted in the [Rule 50(b)] motion." *Lifshitz v. Walter Drake & Sons, Inc.*, 806 F.2d 1426, 1429 (9th Cir. 1986) (emphasis added). As such, a Rule 50(a) "motion that identifies one element of a claim is insufficient to permit the district court to grant JMOL for lack of proof of some other,

---

based solely upon Question Two, EA's waiver as to Question One is not relevant here.

unspecified, element, and is insufficient to permit appellate review of the sufficiency of the evidence as to the unspecified element." *Tolbert v. Queens Coll.*, 242 F.3d 58, 77 (2d Cir. 2001).

In *E.E.O.C. v. Go Daddy Software, Inc.*, this Court held that a preverdict Rule 50(a) motion based on insufficient evidence of defendant's knowledge of protected activity did not preserve arguments about whether there was sufficient evidence that (i)  plaintiff's conduct was protected activity, and (ii) plaintiff's protected activity motivated his termination, even though the latter two issues were also elements of plaintiff's retaliation claim. 581 F.3d 951, 961-63 (9th Cir. 2009). Other circuits have reached similar results when a Rule 50(a) motion did not include the specific grounds subsequently asserted in a Rule 50(b) motion. *See, e.g.*, *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 845 (Fed. Cir. 2010) (Rule 50(a) argument on anticipation held insufficient to preserve Rule 50(b) argument regarding "different theory" of obviousness), *aff'd*, 131 S. Ct. 2238 (2011); *Conseco Fin. Servicing Corp. v. N. Am. Mortgage Co.*, 381 F.3d 811, 822 (8th Cir. 2004) (Rule 50(a) argument that plaintiff failed to offer sufficient evidence that damages were proximately caused by defendant's misconduct held insufficient to preserve Rule 50(b) arguments about whether plaintiff had proven damages); *Zachar v. Lee*, 363 F.3d 70, 74 (1st Cir. 2004) (Rule 50(a) argument that breach of

contract and breach of implied covenant of good faith and fair dealing claims were

duplicative held insufficient to preserve Rule 50(b) argument that finding of breach

of contract is prerequisite to finding of breach of implied covenant of good faith

and fair dealing); *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 164 (2d Cir. 1998)

(Rule 50(a) arguments about evidence of discrimination and constructive discharge

held insufficient to preserve Rule 50(b) argument concerning willfulness).

Because EA waived any argument concerning virtual identity of games as a

whole by failing to raise the issue in its preverdict Rule 50(a) motion, the court was

without authority to enter JMOL on that ground. *See Murphy*, 914 F.2d at 186.

With no other ground for JMOL, reversal is required.

## II. The district court incorrectly required Antonick to prove that Sega Madden was "virtually identical" to Apple II Madden.

Even if the court were permitted to enter JMOL on a ground never raised in

EA's Rule 50(a) motion, the ruling was premised on an erroneous legal standard,

embodied in jury instructions, that for Sega Madden to be a Derivative Work of

Apple II Madden, the works must be virtually identical when considered as a

whole, including both protected and unprotected elements.

As the court recognized, Sega Madden is a Derivative Work if, absent

consent, it would infringe on the copyright of Apple II Madden by copying

protected elements. *See Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435,

1442 (9th Cir. Cir. 1994). Absent direct evidence of copying, a party can prove copying circumstantially with evidence of (1) access to the original work and (2) "substantial similarity" between protected portions of the copyrighted work and the allegedly infringing work. *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 636-37 (9th Cir. 2007).[7]

"This Court has traditionally employed a two-part test to determine whether two works are substantially similar: an extrinsic test and an intrinsic test." *Id*. at 637. The extrinsic test, performed by the court, objectively considers whether similarities between works are unprotectable ideas or potentially protectable expressions. *Apple Computer*, 35 F.3d at 1443. The court also applies relevant limiting doctrines, including merger, scenes a faire, and lack of originality. *Id*. at 1443-45. "When the unprotectable elements are 'filtered' out, what's left is an author's particular expression of an idea, which most definitely *is* protectable." *Mattel, Inc. v. MGA Entertainment, Inc*., 616 F.3d 904, 913 (9th Cir. 2010) (emphasis in original).

---

[7] More precisely, a showing of access and substantial similarity creates a prima facie case and presumption of copying, shifting the burden to the alleged infringer to rebut the presumption through proof of independent creation. *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 486 (9th Cir. 2000). The jury here properly found that EA did not prove independent creation. ER 329.

The intrinsic test, performed by the jury, considers whether an ordinary reasonable observer would consider protectable elements of works to be substantially similar. *See, e.g., Funky Films, Inc. v. Time Warner Entertainment Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006). "The general test for determining substantial similarity is whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Warner Bros. Inc. v. Am. Broadcasting Cos.*, 654 F.2d 204, 208 (2d Cir. 1981). Where the alleged infringer had a high degree of access to the original work, this Court, under its "inverse ratio" test, requires a lesser showing of substantial similarity to prove copying. *Three Boys Music*, 212 F.3d at 486.

A finding of substantial similarity between two works cannot ordinarily be based on unprotectable elements. *Mattel*, 616 F.3d at 916. However, a jury may find that a *combination* of unprotectable elements is itself protectable and indicative of substantial appropriation of the original work. *Three Boys Music*, 212 F.3d at 485. Moreover, to the extent that there remains a narrow range of possible expressions of underlying ideas, the owner of the original work retains a limited, or "thin," copyright protection against "virtually identical" copying. *Apple Computer*, 35 F.3d at 1439, 1446; *Mattel*, 616 F.3d at 915.

Here, before Phase II of the trial began, the court ruled that, "[d]ue to the narrow range of possible expressions for a football video game and the fact that only two of the ten [sic] similar elements are protectable," "Antonick's work is entitled to only thin protection," so "[f]or purposes of the intrinsic test, the appropriate standard for illicit copying is virtual identity." ER 352-353. Antonick objected to the "virtual identity" standard. ER 353 n.10.

In jury instructions, again over Antonick's objections (ER 311-333), the court identified two protected elements – source code expressions of (1) field width and (2) plays and formations. The court continued, "You have also heard about other elements or features of Apple II Madden that are not protectable by copyright," and listed ten such unprotected elements, including all nine determined on summary judgment to be unprotected, *see supra* pp. 14-15, along with "Printed play books," which the court determined were not protected expressions of the play-selection feature. The court then stated:

> In order to find for Mr. Antonick, he must prove that Sega Madden is a Derivative Work of Apple II Madden. Plaintiff, therefore, must prove two facts by a preponderance of the evidence.
>
> First, he must prove that there are substantial similarities between (1) the expressions in the source code of field width or (2) the expression in the source code of plays and formations found in both works.

-31-

> Second, he must prove by a preponderance of the evidence that considering Sega Madden as a whole – that is, considering both the protected and unprotected elements – an ordinary reasonable observer would find Sega Madden virtually identical to Apple II Madden.

ER 329.

The jury found in favor of Antonick on both issues. ER 322-323.

Nevertheless, the court entered JMOL for EA. According to the court, the evidence did not support the verdict on Question Two, because Antonick failed to present evidence that any version of Sega Madden was "virtually identical" to Apple II Madden when the games were considered "as a whole," including both protected and unprotected elements. That conclusion was erroneous, for the following reasons:

### A. Requiring both (1) substantial similarity of protected elements and (2) virtual identity of the works as a whole was unsupported by law.

As discussed above, the "virtual identity" test provides limited copyright protection where "substantial similarity" of protected elements is not at issue, generally because (1) there are no protected elements or (2) protected elements are *de minimus*. *Apple Computer*, 35 F.3d at 1439, 1446. The "virtual identity" test, in other words, is an alternative means of establishing illicit copying where material is virtually identical; it is not an additional requirement for establishing illicit

-32-

copying where "substantial similarity" of protected elements has already been shown. As this Court noted when it applied the "virtual identity" test to "doll sculpts" in *Mattel*, "[a]pplying this [virtual identity] test doesn't create a circuit split," because "[a]lthough other courts have invoked a 'substantial similarity' test in cases involving dolls, they've used it to compare only the protectable features of the dolls, rather than the dolls overall." 616 F.3d at 916 n.9. "When there are few protectable features not required by the underlying idea, applying the substantial similarity test to them is effectively the same as determining whether the dolls or doll sculpts are virtually identical overall." *Id*. at 916 n.9.

By requiring the jury to find that (1) protected elements are substantially similar *and* (2) the works as a whole are virtually identical, the court required Antonick to prove his case twice under two different tests. Since the jury found that protectable elements were substantially similar, Antonick established a prima facie case of illicit copying, and it was unnecessary to prove also that the works, as a whole, were virtually identical.

### B. The virtual identity standard is inconsistent with the parties' contractual definition of a "Derivative Work."

Even if a court could, in an appropriate case, require both "substantial similarity" of protected elements and "virtual identity" of the works as a whole, Question Two of the special verdict form was still incorrect as a matter of law

here, because only the "substantial similarity" standard is compatible with the 1986 Contract. That contract defines a Derivative Work to include, for example, games with "significant enhancements of the Work to add additional features or improve performance" and "adaptations of the Work to operate on computers or operating systems other than those described in the Specifications." ER 560 § 1.03. Since significant enhancements and adaptations clearly could change the Work by "more than a trivial degree,"[8] thereby failing to satisfy the virtual identity standard, that standard is inconsistent with the parties' intent. *See* Cal Civ. Code § 1641; *In re Quantification Settlement Agreement Cases*, 201 Cal.App.4th 758, 799 (Cal. Ct. App. 2011).

### C. The wide range of expression in protectable elements of Apple II Madden warrants broad protection under the "substantial similarity" standard.

As discussed, *supra* pp. 15, 31, the court held that, "[d]ue to the narrow range of possible expressions for a football video game and the fact that only two of the ten [sic] similar elements are protectable," "Antonick's work is entitled to only thin protection," so "[f]or purposes of the intrinsic test, the appropriate standard for illicit copying is virtual identity." In this respect, too, the court erred.

---

[8] ER 11 (citing *Merc. Transaction Sys., Inc. v. Nelcela, Inc.*, 2009 WL 723001, at *17 (D. Ariz. Mar. 18, 2009)). Antonick does not concede that, in this case, EA changed the Work by more than a trivial degree.

### 1. Wide Range of Expression in Plays and Formations.

Although the court held that "there is a narrow range of possible expressions for a football video game," it provided no support. Indeed, the court acknowledged that plays and formations constitute a protectable element of the game, and there is considerable evidence of a wide range of expression in that element alone. As discussed, *supra* p. 9, EA's own founder and CEO, Trip Hawkins, testified that "you can make an infinite number of football plays," and there was a "whole lot of organizing and refinement and editing to come up with a good scheme." ER 150:7-22. Antonick similarly testified that, in developing Apple II Madden, he created and discarded "hundreds" and "[p]erhaps even thousands" of plays as he refined the game. ER 825:4-6. Kawahara testified, "I don't think we even came close to reaching the limit" to "the number of plays" that could be created from the principles and "skeleton plays" outlined in John Madden's "playbook," ER 816:7-8, 12, and further testified that there was "no" overlap of plays in Apple II Madden and another company's football simulation game on which he had previously worked. ER 816:23-817:1. There was, then, a very wide range of expressing plays and formations. Substantial similarity in that expression coupled with a high degree of access presents a prima facie case of illicit copying, without any showing that works are virtually identical as a whole. *See, e.g.*, *Mattel*,

616 F.3d at 913-14 ("If there's a wide range of expression … then copyright protection is broad and a work will infringe if it's substantially similar to the copyrighted work."); *Three Boys Music*, 212 F.3d at 482-83, 486 (high degree of access lessens required showing of substantial similarity).

### 2. Significant Number of Protectable Elements.

Insofar as the court relied on the small number of similar protectable elements in deciding to require "virtual identity" of the works as a whole, the court erred in holding that the only arguably protectable elements in Apple II Madden were field width and plays and formations.

First, relying on *Oracle Am., Inc. v. Google Inc*., 872 F. Supp. 2d 974 (N.D. Cal. 2012), the court reasoned that, under 17 U.S.C. § 102(b), any element characterized as a "system," "method of operation," "procedure," or "process" is uncopyrightable "by definition," thereby excluding, as unprotectable, such elements as the direction tracking system[9] and data flow architecture.[10] *See, e.g.*,

---

[9] Antonick used a unique clockwise direction and tracking system in which object movements were limited to eight compass-like directions. ER 1087. Despite better alternatives, 1990 Sega Madden used the same system. ER 1090-1094. In Barr's opinion, EA likely copied this feature to facilitate copying of Antonick's plays. ER 1098, 1161.

[10] "Data flow architecture" refers to Antonick's decisions about what data to use, format of data, how data would move through the program, and where data would be used. ER 1117.

ER 1228 (expert report "repeatedly refers to Antonick's direction tracking as a 'system,'" which is uncopyrightable), ER 1235 n.26 (expert report characterizes data flow architecture as a "process," which is "by definition" not copyrightable). As the Federal Circuit recently discussed, however, in reversing *Oracle* under Ninth Circuit law, courts have found that "classifying a work as a 'system' does not preclude copyright for the particular expression of that system," and "under Ninth Circuit law, an original work – even one that serves a function – is entitled to copyright protection as long as the author had multiple ways to express the underlying idea." *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1366-67 (Fed. Cir. 2014). "Even if an element directs a computer to perform operations, the court must nevertheless determine whether it contains any separable expression entitled to protection." *Id*. The court never performed that analysis here.

Second, the court held that a number of elements in Apple II Madden, including Antonick's player ratings model, were unprotectable under the scenes a faire doctrine, because they were "inherent elements of football." *See, e.g.*, ER 1219-1220. The scenes a faire doctrine does not apply, however, merely because the original work contains an expression of a feature that is inherent to the underlying idea of the work. Rather, the doctrine serves only as a defense to an infringement claim where similarity of expression necessarily results from the fact

-37-

that the common idea is only capable of expression in more or less stereotyped form. *Oracle*, 750 F.3d at 1364 (citing 4 *Nimmer on Copyright* § 13.03[B][3]). That player ratings may be inherent to a realistic football videogame does not mean that similarity to a particular ratings model is a necessary incident of any expression of player ratings. On this point, the court erred.

Third, the court held that Antonick's "printed play books" for Apple II Madden were not protected under copyright law, because Antonick had no contractual interest in the paper playbook or manual that accompanied the game. ER 999:12-25. The relevant issue, however, was whether the playbook was part of the Work from which Derivative Works might be made. The 1986 Contract defined the "Work" as "the computer software program identified in Paragraph I *and its documentation and related items* as more fully described in Exhibit B." ER 560 § 1.01 (emphasis added). Exhibit B required Antonick to provide "instructions necessary for normal and competent operation of all game features and basic permutations," which would include the book of plays available to the user. ER 587. Moreover, the playbook expressed the selection and arrangement of plays in Antonick's source code for the Apple II Madden, ER 999:3-11, which would be copyrightable even if the plays themselves were not, as long as the selection and arrangement was not so "mechanical or routine as to require no creativity

-38-

whatsoever." *Urantia Found. v. Maaherra*, 114 F.3d 955, 959 (9th Cir. 1997); *see also Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc*., 499 U.S. 340, 358 (1991).

In sum, the court failed to consider the wide range of expression in a number of protectable elements of Apple II Madden, erroneously concluding that a subsequent version of the game could be a Derivative Work only if it was virtually identical to the original work as a whole.

### D. The district court erroneously required virtual identity of the entire works, to be determined by the jury without expert help.

The erroneous imposition of a "virtual identity" standard was compounded by the requirement that Antonick prove virtual identity of the works "as a whole." There is ample support in this Circuit for an intrinsic test that asks the jury to determine illicit copying based not on the works as a whole, but on protectable expression only. *See, e.g.*, *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1398 (9th Cir. 1997) ("Substantial similarity may be found whenever the works share significant similarity in *protected expression* both on an objective, analytical level and a subjective, audience-response level." (emphasis added)); *Olson v. Nat'l Broad. Co., Inc.*, 855 F.2d 1446, 1449 (9th Cir. 1988) ("To demonstrate substantial similarity, [the plaintiff] must prove … substantial similarity of the *protectable expression ...* under the intrinsic test." (emphasis added)); *Cooling Sys. & Flexibles, Inc. v. Stuart Radiator, Inc.*, 777 F.2d 485, 492-

-39-

93 (9th Cir. 1985) ("What is important is not whether there is substantial similarity in the total concept and feel of the works," but whether the "small amount of *protectible expression ...* is substantially similar" (emphasis added)), *overruled on other grounds*, *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994). Indeed, in another videogame case, the court below did precisely that, stating: "In the intrinsic test the Court focuses on the *key protectable elements* (here avatars) to determine whether an ordinary reasonable observer would consider the copyrighted and challenged works substantially similar or virtually identical." *OG Int'l, Ltd. v. Ubisoft Entm't*, 2011 WL 5079552, at *7 (N.D. Cal. Oct. 26, 2011) (Breyer, J.) (emphasis added), *aff'd sub nom. OG Int'l, Ltd. v. Ubisoft, Inc.*, 468 F. App'x 787 (9th Cir. 2012) (holding that "the district court correctly identified the legal standard[] for copyright").

Rather than focus on protectable elements, the court here framed the intrinsic test in terms of "an ordinary person's subjective impressions of the similarities between … Apple II Madden as a whole [and] Sega Madden as a whole." ER 9-10 (citing *Funky Films*, 462 F.3d at 1077). The line of cases on which the court relied asks the jury to consider the "concept and feel" of works as whole, an "interpretive judgment" that is "by nature an individualized one that will provoke a varied response in each juror." *Shaw v. Lindheim*, 919 F.2d 1353, 1360

-40-

(9th Cir. 1990). Because the focus is on the audience's "interpretive judgment," expert analysis is deemed inadmissible. ER 14 (citing cases). But unlike screenplays and television shows involved in those cases, this case involves source code and other highly technical elements of computer programs. It was not credible that jurors could discern the "total concept and feel" of these complex works without expert help, simply by "viewing" each work.[11] "The phrase ["total concept and feel"] is geared toward simplistic works that require only highly intrinsic (i.e. unanalytic) evaluation; it serves no purpose in the realm of computers, where analytic dissection and expert testimony emphatically are needed." 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.03[A][1][c]; *see also Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 839 n.15 (10th Cir. 1993) ("The 'total concept and feel' test was developed in different contexts and it is not very helpful in comparing similarities among protected components of computer codes.").

As recognized in the seminal computer case *Computer Assocs. Int'l, Inc. v. Altai, Inc. ("Altai")*, 982 F.2d 693 (2d Cir. 1992), "[i]n the context of computer programs, many of the familiar tests of similarity prove to be inadequate, for they were developed historically in the context of artistic and literary, rather than

---

[11] ER 13.

utilitarian, works." 982 F.2d at 713-14. "In making its finding on substantial similarity with respect to computer programs, we believe that the trier of fact need not be limited by the strictures of its own lay perspective." *Id.*[12]; *see also Atari Games Corp. v. Nintendo of Am. Inc.*, 975 F.2d 832, 844-45 (Fed. Cir. 1992) (Ninth Circuit permits expert testimony at intrinsic stage because "[i]n the context of computer programs, the 'ordinary reasonable person' … is a computer programmer).[13] Under *Altai*'s abstraction-filtration-comparison test, endorsed in this Circuit,[14] the court filters out nonprotectable elements of plaintiff's computer program, and the remaining "golden nugget" of protectable material is compared with defendant's work to determine, with expert testimony if appropriate, whether infringement exists. *Altai*, 982 F.2d at 710; *accord Gates Rubber Co.*, 9 F.3d at 839 n.15.

---

[12] In entering JMOL, the court cited *Altai* for the proposition that expert testimony is generally "irrelevant and not permitted" when the "art form" is "comprehensible" to a "lay person." ER 14 n.10. *Altai*, however, expressly rejected this limitation in the context of computer software, given the "highly complicated and technical" issues. 982 F.2d at 713.

[13] Other circuit courts have reached similar conclusions about the suitability of expert evidence in certain circumstances. *See, e.g.*, *Kohus v. Mariol*, 328 F.3d 848, 857 (6th Cir. 2003); *Dawson v. Hinshaw Music Inc.*, 905 F.2d 731, 736 (4th Cir. 1990).

[14] *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1085 (9th Cir. 2005); *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1525 (9th Cir. 1992).

Given the "highly complicated and technical subject matter" here, *Altai*, 982 F.2d at 713, the court should have employed the "abstraction-filtration-comparison" test instead of the "total concept and feel" test used for artistic works. Since the court already filtered out unprotectable elements of Apple II Madden on summary judgment, ER 1218-1235, it was left to the jury, with expert help, to compare the protectable core of that game to EA's Sega Madden games. In fact, this is precisely what the jury was asked to do in Question One. *See* ER 321-323. Because the jury found in Antonick's favor on Question One and EA's Rule 50(b) motion on that question was denied, JMOL should be reversed.

## III. Even under the test requiring virtual identity of the works as a whole, substantial evidence supports the verdict.

"We will not second-guess the jury's application of the intrinsic test." *Three Boys Music*, 212 F.3d at 485. Nevertheless, the court did so here. According to the court, "the jury had no evidence of Apple II Madden or Sega Madden as a whole," and in the absence of evidence of the games "in their entirety," the jury could not conclude that the works were "virtually identical as a whole." ER 11.

The court erred. As it acknowledged, *id.*, this Court has not defined what it means for works to be "virtually identical." But neither has it defined what it means for works to be virtually identical "as a whole." Here, the district court instructed the jury that, in addition to evidence about protected elements of field

-43-

width and plays and formations, it had also "heard about other elements or features of Apple II Madden that are not protectable by copyright," and proceeded to enumerate them. ER 328. The court then instructed that, in addition to proving substantial similarities in one or more protected elements, Antonick was required to "prove by a preponderance of the evidence that considering Sega Madden as a whole – *that is, considering both the protected and unprotected elements* – an ordinary reasonable observer would find Sega Madden virtually identical to Apple II Madden." ER 329 (emphasis added).

If the court has now concluded that evidence of a work "as a whole" requires something other than evidence of "the protected and unprotected elements," it has not said what that evidence might be. Nor has the court said what other "protected and unprotected elements" might have been introduced, but were not. And while the court now says that the jury may not compare works "element by element," ER 12, it does not claim to know whether, in "considering both the protected and unprotected elements," the jury actually did compare works "element by element" rather than as "as a whole."[15] Nor does the court address, apart from similarities in

---

[15] In any event, controlling Ninth Circuit precedent holds that it is "appropriate" to "perform analytic dissection" under the intrinsic test as long as it is done with similarities, not dissimilarities. *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 901 (9th Cir. 1987); *see also Apple Computer*, 35 F.3d at 1446. Taking into account such dissimilarities "would allow an unscrupulous defendant to copy large or

-44-

the many enumerated elements, additional evidence of virtual identity of the
works, such as Kawahara's testimony that both games had the "same" user
interface, ER 817:24-818:3, and Hilleman's admission that he had "possibly"
stated that the only difference between Simmons's (Sega) game and Antonick's
(Apple II) game was a different "surface aesthetic," ER 880:9-20.

    In addition to asserting that there was no evidence of the works as a whole,
the court also said there was no evidence that the six Sega Madden games
"subsequent to 1990" were virtually identical to Apple II Madden. ER 11-15. Barr,
however, testified that EA changed few elements of its 1990 Sega Madden source
code when releasing subsequent Sega games. ER 902:16-903:15. Other than
changes he outlined, like updated player ratings and the addition of even more
plays from Apple II Madden, those subsequent games were "essentially the same."
ER 903:13-25; 945:8-15. In fact, from a programming perspective, he would have
considered them to be nothing more than minor updates of the exact same product.
ER 904:1-23. Consistent with this, EA stipulated that each Sega game "used code"
from the prior game. ER 907:19-908:22. The jury could reasonably conclude that

---

qualitatively significant portions of another's work and escape liability by burying
them beneath non-infringing material in the defendant's own work, even where the
average audience might recognize the appropriation." *Newton v. Diamond*, 388
F.3d 1189, 1195 (9th Cir. 2004).

Sega Madden underwent only trivial changes over the period 1991-1996 and that, consequently, the releases of Sega Madden subsequent to 1990 were virtually identical to Apple II Madden and 1990 Sega Madden.

**IV.  The district court erroneously granted a new trial to EA regarding Antonick's claims for unpaid royalties on Derivative Works.**

    **A.  The court erroneously granted a new trial on virtual identity (Question Two of the special verdict form).**

In addition to granting JMOL on virtual identity, the district court conditionally granted EA a new trial on the ground that the jury's verdict on virtual identity was "against the clear weight of the evidence." ER 16. As discussed, *supra* pp. 28-43, the court granted JMOL based on its erroneous holding that Antonick must prove "virtual identity" of the games "as a whole." The court necessarily abused its discretion in granting a new trial on the same grounds. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990).

    **B.  The court erroneously granted a new trial on substantial similarity (Question One of the special verdict form).**

The court also granted a new trial on substantial similarity of protected elements, based solely on its belief that Barr, Antonick's source code expert, "used flawed methods to support his opinion that EA copied Antonick's protectable expression." ER 16. The court offered two examples of Barr's "flawed methods."

First, referring to his use of Demonstrative Exhibit 476, the court said that Barr used "visual images [of the plays and formations in each game] generated from binary data" to show similarity in source code expression of plays and formations, which the court considered "flawed" because the required similarity must be in protected expression, not output of expression. *Id*. at 17-18. During trial, however, EA did not object to Barr's use of Exhibit 476 on that basis. Rather, EA argued that the exhibit was irrelevant because it was generated from "play data" instead of "source code." ER 926:6-9. EA then abandoned that objection when it agreed to a jury instruction defining "source code" to include the "binary files" containing the play data. ER 1009:19-20 ("for the purposes of [the jury's] deliberation, the term source code includes binary files."); 1022:17-18; *cf. Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 602 (9th Cir. 2000) (holding that both source code and binary code constitute copyright protectable expression).

In post-trial motions, EA raised the objection that Exhibit 476 was a misleading "visual comparison" based on "mere conjecture." ER 45. But errors raised for the first time in a post-trial motion are waived. *Beech Aircraft Corp. v. United States*, 51 F.3d 834, 841 (9th Cir. 1995). Moreover, a "motion for a new trial should not be granted … where the moving party has failed to timely object to

-47-

the alleged impropriety giving rise to the motion." *Dennis v. Gen. Elec. Corp.*, 762 F.2d 365, 367 (4th Cir. 1985). By failing to raise the supposedly misleading nature of Exhibit 476 at trial when it might have been remedied if necessary, EA deprived Antonick of the right to build his case and left "open the possibility of a lengthy and expensive retrial." *Beech Aircraft Corp.*, 51 F.3d at 841.

Even if the objection had been timely, however, the court appears to have misunderstood Barr's analysis and use of Exhibit 476. First, Barr did not "reverse engineer" source code of plays and formations from binary files, as the court believed. *See* ER 17. Rather, Barr extracted the depiction of initial starting positions, or formations, directly from original source code of Antonick's play editor (ER 919:23-921:7), and extracted the depiction of plays (that is, the movements of player avatars) from binary files. ER 924:18-925:11. Barr then created Exhibit 476 from actual player coordinates expressed in the code. ER 925:12-926:25. The court's decision to permit the jury to view Exhibit 476 was not "tantamount to granting [Antonick] ownership of the particular play itself." *See* ER 18. Instead, like any demonstrative exhibit, Exhibit 476 appropriately summarized Barr's findings in a graphical form that aided the jury in understanding his testimony.

-48-

The court's second example of Barr's "flawed methods" was his use of similarities in allegedly unprotected elements as evidence that protectable elements were copied. ER 19-20. Among other things, the court observed that, in opining that Sega Madden "relied on" source code from Apple II Madden, Barr noted similarities in (1) the use of a mistakenly wide field; (2) *x* and *y* coordinates of the field; (3) misspelled terms representing the line of scrimmage; (4) subroutine names, label names, and strings; and (5) players' formations and movements. *Id*. at 19. The court said it is "well-settled" that no reliance may be placed upon any similarity in expression resulting from unprotectable elements. *Id.*

The court's concern about inappropriate use of unprotected elements is unwarranted. First, during trial, when EA moved to exclude Barr from testifying about unprotectable elements, the court denied that motion, saying "it's important to demonstrate to the jury … the context in which the alleged copying took place," and it is up to the jury to determine the weight to accord evidence concerning unprotectable elements as long as a "proper limiting instruction" is given. ER 796:15-797:9; *see also id*. at 797:10-23. The jury was, in fact, given such a limiting instruction, during Barr's testimony, that its "task will be to determine whether the two [copyrightable] elements" were copied, but it would be allowed to consider evidence of unprotectable elements for "context." ER 948:11-21. At the close of

-49-

evidence, the court reiterated that a finding of substantial similarity must be based on similarity of protectable expression and specifically enumerated which elements were protectable and which were not. ER 328. There is a "strong presumption" that limiting instructions are followed. *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1270-71 (9th Cir. 2000).

Second, as discussed above, *supra* p. 48, Barr's testimony regarding substantial similarity of the protectable plays and formations was grounded in a review of the source code and binary data for those elements. This evidence was sufficient to support the verdict. To the extent that Barr opined on EA's copying of additional unprotectable elements, as the court permitted him to do for "context," he did so to rebut EA's defense that plays and formations were independently developed. ER 808:25-809:9; *see also* ER 57.

Third, although similarities in unprotectable elements may not establish illicit copying, it is also "well-settled" that similarities in a combination of unprotectable elements may indicate substantial appropriation. *Three Boys Music*, 212 F.3d at 485; *see also, e.g.*, *Softel, Inc. v. Dragon Med. & Scientific Commc'ns*, 118 F.3d 955, 964 (2d Cir. 1997) (noting that, "in *Feist*, the Court made quite clear that a compilation of non-protectible elements can enjoy copyright protection even though its constituent elements do not"). Antonick's protected expression of his

-50-

plays and formations was, after all, a collection of elements, including the use of an oversize field width, bizarre spellings, idiosyncratic names of subroutines and plays, unusual character strings, and personal choices in play selection and arrangement, *see e.g.,* ER 910:16-938:12, and the court has not said why similarities in such constituent parts do not indicate similarity in protected elements. As the Federal Circuit remarked in *Oracle*, "[b]y analogy, the opening of Charles Dickens' *A Tale of Two Cities* is nothing but a string of short phrases. Yet no one can contend that this portion of Dickens' work is unworthy of copyright protection because it can be broken into those shorter constituent components." 750 F.3d at 1363.

In sum, the court's belief that it allowed Barr to testify using "flawed methods" does not warrant second-guessing the jury's verdict. The court abused its discretion in ordering retrial on those grounds.

## V. The district court erred in dismissing claims based on the SNES platform.

### A. The court erroneously concluded, as a matter of law, that the SNES and Apple II microprocessors are not in the same "Microprocessor Family."

As noted, *supra* p. 16 n.4, "Phase II" of the trial was not initially limited to whether Sega Madden was a Derivative Work of Apple II Madden. Rather, Antonick also sought to show that five versions of the game released for the Super

Nintendo Entertainment System (SNES) were Derivative Works upon which Antonick was entitled to royalties. The court, however, held that the SNES and Apple II microprocessors were not in the same "Microprocessor Family," so that, under Amendment 1 to the 1986 Contract, Antonick was, as a matter of law, entitled to no royalties on SNES Madden. ER 957:8-958:4.

The court erred. Under Amendment 1, Antonick receives a royalty on Derivative Works by Publisher whose platform is in the "Same Microprocessor Family" as the Apple II's 6502 microprocessor, but receives no royalty on Derivative Works by Publisher whose platform is in a "Different Microprocessor Family." ER 485-489. Section 1.04 of the 1986 Contract defines "Microprocessor Family" as "a single microprocessor and all related microprocessors that utilize the same instruction set and have the same instruction and data word size." ER 560 § 1.04. At trial, EA contended that the SNES's 65816 microprocessor and the Apple II's 6502 microprocessor were not in the "Same Microprocessor Family," because the 65816 microprocessor utilizes a 16-bit word size, while the 6502 microprocessor utilizes an 8-bit word size. As a matter of "contract interpretation," the district court agreed, and dismissed Antonick's claim for royalties on the SNES game. ER 957:8-958:4.

-52-

That ruling, however, was contrary to the evidence. As explained by Antonick's videogame industry expert, Garry Kitchen, the 65816 microprocessor "powers up" in an 8-bit mode with the exact same instruction set and word size as the 6502 microprocessor. ER 859:23-860:6; *see also id.* at 858:13-17. It can remain in this "emulation" mode or switch to a 16-bit mode with an expanded instruction set and 16-bit word size. ER 860:7-10. According to Kitchen, however, its capacity to operate with a 16-bit word size does not place it in a different "Microprocessor Family." Rather, in the "videogame industry," a microprocessor is considered in the same microprocessor family if it is "backward compatible with previous processors in its family," as the 65816 microprocessor was with respect to the 6502 microprocessor. ER 857:2-11. Supporting Kitchen's testimony, the manufacturer's website referred to the SNES microprocessor as an "8/16 bit microprocessor," and not merely a 16-bit microprocessor. ER 860:11-14.

The court rejected Kitchen's testimony, holding that, if the SNES microprocessor "utilizes both" 8-bit and 16-bit word sizes, then it is not in the same Microprocessor Family as the Apple II microprocessor, and "it's out." ER 957:8-958:4 The court's interpretation, however, ignores the plain language of section 1.04, which requires only that microprocessors "utilize" the same instruction set and "have" the same instruction and word size. ER 560 § 1.04.

In 8-bit mode, the SNES microprocessor utilizes the same instruction set and has the same word size as the Apple II microprocessor, so it is in the "Same Microprocessor Family" as that term is contractually defined.

Even if the contract is ambiguous, Kitchen's testimony about usage in the videogame industry is admissible extrinsic evidence. *See Parsons v. Bristol Development Co*., 62 Cal. 2d 861, 865 (1965). Moreover, Kitchen's interpretation makes sense. As Kitchen explained, the industry uses backwards compatibility to delineate microprocessor families because coding for a new platform is more difficult absent backwards compatibility. ER 862:20-863:20. It is understandable that Antonick might not be entitled to the same royalty where the Derivative Work by Publisher is in a "Different Microprocessor Family," requiring substantially increased costs of coding.

Under California law, a dispute about the weight or import of industry practice can only be resolved by the jury. *Parsons,* 62 Cal. 2d at 865; *see also City of Hope Nat. Med. Ctr. v. Genentech, Inc*., 43 Cal. 4th 375, 395 (2008). The court erred in short-circuiting this process.

-54-

**B.    Even if the SNES microprocessor were not in the same Microprocessor Family as the Apple II microprocessor, Antonick's development of Apple II GS Madden revived his rights.**

As discussed, *supra* p. 52, Amendment 1 provides that Antonick is not entitled to a royalty if the SNES microprocessor is in a different "Microprocessor Family" from the Apple II microprocessor. This provision, however, is subject to an important restriction. If Antonick developed a work for a "New Microprocessor Family," then he "shall be entitled to written notice and the opportunity to develop additional Derivative Works for the New Microprocessor Family." ER 485-489. That restriction is significant because Antonick developed a game for the Apple II GS, an enhanced version of the Apple II with the identical microprocessor used in the SNES microprocessor. *See* ER 551-552 (Apple II GS game); 861:15-18. Thus, even if the SNES and Apple II microprocessors were in different microprocessor families, developing the Apple II GS game entitled Antonick to first right of refusal to develop SNES Madden. As Antonick was compensated for development work with royalties, they were an appropriate measure of damages, and the most reasonable rate is the contractual rate for the predecessor NES platform.[16]

---

[16] Alternatively, disgorgement of profits would have been appropriate. *See infra* pp. 59-60.

The court dismissed this argument as too "speculative" as a matter of law. ER 960:1-961:21. That ruling ignored the appropriate standard for establishing damages. Under California law, Antonick need only establish "with reasonable probability the existence of some causal connection between [EA's] wrongful act and some loss of the anticipated revenue" – in this case, royalties. *See Diesel Elec. Sales & Serv., Inc. v. Marco Marine San Diego, Inc.,* 16 Cal. App. 4th 202, 219 (1993). Once that is accomplished, "the jury will be permitted to act upon probable and inferential proof" and make "a reasonable estimate of the damage based on relevant data." *Id.*

Here, Antonick was *already* developing a game for the predecessor NES platform when he was told by EA to cease development. ER 764:9-775:14; 777:17-790:2. A jury could find that he would have shifted those efforts to the next generation Nintendo platform if given the opportunity, and the court erred in prohibiting him from so testifying. ER 835:2-853:14. Nor was it speculative to use EA's actual SNES revenues as the basis for calculating royalties that Antonick would have earned. A jury could "reasonabl[y]" infer that, had Antonick developed the game, it would have earned at least as much as EA's SNES game. *See Stott v. Johnston*, 36 Cal. 2d 864, 875 (1951) ("[O]nce the cause and existence of damages

have been so established, recovery will not be denied because the damages are difficult of ascertainment.").

## VI. The district court erred in precluding evidence in support of Antonick's claim that EA breached its contractual obligations not to use or disclose his Development Aids.

As noted, *supra* p. 7 n.1 and accompanying text, the 1986 Contract recognized that Antonick developed and used "Development Aids," consisting of equipment, firmware, or software utilities that "might be useful to [EA] in developing Derivative Works and Derivative Products." ER 569 § 5.05. EA agreed that Antonick that would retain ownership of his Development Aids. ER 573§ 8.04.

In February 1987, under Amendment 1 to the 1986 Contract, Antonick agreed to waive royalty rights for Derivative Works in certain microprocessor families. ER 488 ¶2. In return, EA agreed not to "use or otherwise provide the Development Aids specified in Paragraph 5.05 to [EA's] employees or applicable third parties for the purpose of developing Derivative Works by Publisher, Different Microprocessor Family." Ex. 488 ¶2.

Here, Antonick alleged that EA misappropriated his Development Aids. As noted, *supra* pp. 15-16, the court never specifically ruled on this claim, but precluded Antonick from introducing evidence in support of any claims other than

-57-

EA's breach of its obligation to pay royalties for Derivative Works and refused to permit any other claims to go to the jury.

The court erred. First, the 1986 Contract does not permit EA to use Antonick's Development Aids in preparing games that did not constitute Derivative Works. Thus, insofar as EA was claiming that Sega Madden was not a Derivative Work, EA could not use Antonick's Development Aids.

Second, Amendment 1 to the 1986 Contract precluded EA from using or otherwise providing Antonick's Development Aids to employees and third parties "for the purpose of developing Derivative Works by Publisher, Different Microprocessor Family." Insofar as EA was claiming that SNES was a Derivative Work by Publisher for a "Different Microprocessor Family," *see supra* p. 52, EA was prohibited from using or providing Antonick's Development Aids for developing the SNES game. ER 798:4-14.

Third, the court stated that it excluded evidence of "ancillary contract breaches" because Antonick failed to demonstrate damages that were "separate" from royalties for Derivative Works. ER 21-22. Antonick, however, was not merely seeking royalties for Derivative Works. Rather, insofar as EA was claiming that Sega Madden was not a Derivative Work, Antonick was seeking royalties as an appropriate measure of damages for unlawfully using his Development Aids in

-58-

preparing a nonderivative work. ER 801:19-802:14. Under California law,

Antonick was entitled to seek damages in the amount of lost royalties under

multiple "theories of recovery," *Tavaglione v. Billings*, 4 Cal. 4th 1150, 1158

(1993), and any duplicative awards could be eliminated by the court after trial, *id*.

Fourth, as an alternative remedy, Antonick sought disgorgement of EA's

profits. Before trial, the court recognized the propriety of a disgorgement remedy.

*See* ER 1236 n.27 (citing *Foster Poultry Farms, Inc. v. SunTrust Bank*, 377 Fed.

App'x 665, 669 (9th Cir. 2010) ("a defendant's unjust enrichment can satisfy the

'damages' element of a breach of contract claim, such that disgorgement is a

proper remedy")). Later, the court ruled that, because disgorgement is an equitable

remedy for the court, evidence as to disgorgement would be excluded from the jury

trial. ER 802:23-804:16. Post-trial, however, after holding as a matter of law that

the evidence did not show that Sega Madden was a Derivative Work, the court

denied disgorgement altogether, holding that "it would have provided a windfall by

awarding [Antonick] more than he would have collected absent the breach."

ER 22. This holding was wrong as a matter of law.

Under California law, EA's profits are appropriate "compensat[ion]" for

Antonick's intellectual property, the benefit received by EA. *See Ajaxo Inc. v.

E*Trade Grp., Inc*., 135 Cal. App. 4th 21, 57 (2005). Indeed, the evidence

demonstrated that when it developed 1990 Sega Madden, EA faced a superior branded competitor, Joe Montana Football, which was marketed by the maker of the Sega Genesis console, ER 301; 490-531; 871:16-23, and if it had not used Antonick's intellectual property, Park Place never could have developed 1990 Sega Madden by the critical holiday sale season and before the release of the Joe Montana game.[17]

In any case, even if an award of all EA's profits might have represented a "windfall," nothing prevented EA from attempting to convince the jury[18] that its profits – in whole or in part – were not due to its access to and use of Antonick's intellectual property. At the very least, Antonick should have been permitted to seek disgorgement in an amount equal to royalties he would have earned, as that amount would not be a "windfall," even as defined by the district court.

---

[17] *See* ER 299-306; 490-531; 532-533; 718-737; 864:4-8; 865:2-10; 865:21-866:17; 867:5-11, 868:2-869:2; 872:2-24; 883:1-11;  884:9-890:23; 894:2-8; 900:4-10; 970:15-971:6; 971:7-972:10; 986:7-990:9; 992:3-994:5.

[18] Under California law, the profits derived from a defendants' breach of a non-disclosure agreement represent a reasonable approximation of the "value" received. *Ajaxo Inc.*, 135 Cal. App. 4th 21 at 248. As such, the amount of disgorgement is properly calculated by the jury. To the extent that the court suggested otherwise, it was in error. On remand, Antonick requests that that the court be instructed to try disgorgement to the jury. ER 802:23-804:16.

## CONCLUSION

The district court's judgment should be reversed and the jury verdict upheld. The case should be remanded for further proceedings, with reinstatement of Antonick's claims for royalties on the SNES game and damages or disgorgement of profits for misappropriation of Antonick's Development Aids.

## STATEMENT OF RELATED CASES

Plaintiff notifies the Court that, to his knowledge, there are no related cases before this Court.

Dated:  August 1, 2014

HAGENS BERMAN SOBOL SHAPIRO LLP

By   /s/ Robert B. Carey
Robert B. Carey
Leonard W. .Aragon
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email: rob@hbsslaw.com
        leonard@hbsslaw.com

Walter H. Sargent
WALTER H. SARGENT, P.C.
1632 N. Cascade Ave.
Colorado Springs, CO 80907
Telephone: (719) 577-4510
Facsimile: (719) 577-4696
Email:  wsargent@wsargent.com

Stuart M. Paynter (226147)
Jennifer L. Murray
Sara Willingham
THE PAYNTER LAW FIRM PLLC
1200 G Street N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622
Email: stuart@smplegal.com
      jmurray@smplegal.com
      swillingham@smplegal.com

005004-11  706437 V1

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email:  steve@hbsslaw.com

*Attorneys for Robin Antonick, Appellant*

-64-

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

☑ This brief contains 13,263 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(iii), or

☐ This brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☑ This brief has been prepared in a proportionally spaced typeface using Microsoft Word Version 2010, in Times New Roman 14 point typeface, or

☐ This brief has been prepared in a monospaced typeface using (state name and version of word processing program) with (state number of characters per inch and name of type style).

Dated: August 1, 2014

HAGENS BERMAN SOBOL SHAPIRO LLP


By   /s/ Robert B. Carey
Robert B. .Carey
Leonard W. Aragon
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email: rob@hbsslaw.com
        leonard@hbsslaw.com

-66-

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 1, 2014.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within three calendar days to the following non-CM/ECF participants:

Brian L. Ferrall, Attorney
Keker & Van Nest LLP
633 Battery Street
San Francisco, CA 94111-1809

HAGENS BERMAN SOBOL SHAPIRO LLP

By __/s/ Robert B. Carey_____
Robert B. Carey
Leonard W. Aragon
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email: rob@hbsslaw.com
         leonard@hbsslaw.com

-67-